### ALSDORF, et al v. BROWARD COUNTY, et al.

No. 73-14152.

Circuit Court, Broward County.

May 18, 1977.

C. Lavon Ward, Fort Lauderdale, for the plaintiffs.

John D. Ayres, Jr., Fort Lauderdale, for the defendants.

Zebedee W. Wright, Fort Lauderdale, for the intervenors.

JAMES F. MINNET, Circuit Judge.

Subsequent to the remand by the order of the Supreme Court dated the 5th day of May, 1976, this cause came on for further proceedings. The parties, no doubt prodded by the suggestion reflected in the mandate, undertook negotiations designed to re-

solve, and remove, as issues in the case, a number of matters which previously had been strongly contested.

As a result of these negotiations, a stipulation dated the 13th day of September, 1976, was entered in the record. This stipulation, among other things, eliminated as an issue in this case any and all ad valorem taxes levied and collected prior to the 1976-1977 fiscal year. Furthermore, the county conceded that a number of budgeted expenditures were of no real and substantial benefit to properties located within municipalities.

Included in these budgeted expenditures was the cost of the Sheriff's Road Patrol "together with an appropriate percentage of the Sheriff's Department administrative overhead properly apportionable to the road patrol activity."

The stipulation reflected that the county commission had determined that this service or activity was "of no real and substantial benefit to the incorporated areas of the county and accordingly no county ad valorem taxes shall be levied on properties located within any municipality within Broward County for said services or activities, all pursuant to the proscription of Article VIII, Section 1(b), Florida Constitution."

Narrowing the triable issues even further in the stipulation, the parties agreed that only three categories of budgeted expenditure for county activity or services remained in dispute and in need of judicial determination. These categories or items were (1) the cost of the Division of Libraries, (2) the cost of the Division of Emergency Medical Services and (3) the cost of the Division of Parks and Recreation.

On September 23, 1976 the court heard a petition by Robert Allen and Charles K. Vermorel to be allowed to intervene in this case. Petitioners Allen and Vermorel alleged themselves to be representatives of a class of taxpayers owning property in the unincorporated areas of the county, having vital interest in the issues and outcome of the instant case. The intervenors especially attacked the referenced stipulation as same disposed of the Sheriff's Road Patrol. The court in the exercise of its discretion granted leave to petitioners to intervene but dismissed, with leave to amend, the complaint in intervention as failing to meet the criteria for stating a class action set down in *Frankel* v. *City of Miami Beach*, 340 So.2d 463 (1976).

Intervenors then amended the complaint in intervention to seek declaratory and injunctive relief on behalf of Robert Allen and Charles K. Vermorel as taxpayers and property owners in their individual capacities only.

The thrust of the intervenors' complaint, simply stated, is that the board of county commissioners of Broward County, by stipulating with the plaintiffs relative to the benefits of the Sheriff's Road Patrol and the source of tax revenues to support same, had either ignored or violated the intervenors' rights as property owners and taxpayers.

The intervenors' complaint, in essence attempted to allege a constitutional violation which could only be described as the "reverse" of the situation complained of by the original plaintiffs. Alsdorf complained of taxation prohibited by Article VIII, Section 1(h) of the Florida Constitution. This constitutional prohibition unilaterally protects properties located within the incorporated sections of the county from taxation for services or benefits exclusively afforded the unincorporated areas. Nowhere is there a constitutional proscription against a levy of ad valorem taxes against properties lying within the unincorporated area to support activities, services or benefits provided to the incorporated areas. Arguably such a provision would be a logical extension of Article VIII, Section 1(b), but obviously this would require reading into the constitution a meaning and intent not clearly set forth.

Unfortunately the complaint of intervenors did not fully articulate the basic grievance which was subsequently revealed at the evidentary hearings.

In the light of evidence adduced by intervenors and the arguments advanced by intervenors' counsel, the court has treated intervenors' complaint as an attack on the taxing policy of the Broward County Commission based upon two grounds. The first ground urged by intervenors questions the correctness of the legislative determination by the county commission with respect to the resulting benefit of the Sheriff's Road Patrol. The second attacks the validity of the legislative determination by attempting to show that the "determination" was not predicated upon any basis of fact but represented merely an effort to settle the dispute with plaintiffs irrespective of the facts.

In summary Allen and Vermorel seek a declaration of their right to have the tax burden of the Sheriff's Road Patrol spread evenly over the entire county tax base rather than imposing the entire burden upon the unincorporated areas of the county.

The defenses to intervenors' claims in the responsive pleadings filed by both plaintiffs and the defendant county were essentially the same. Each asserted that the determination of benefits as well as the placing of the tax burden was a legislative function of the county commission and as such should not be disturbed by the court.

Plaintiff asserted the additional defense that the matter of the Sheriff's Road Patrol had been resolved by the stipulation and was not open to attack by the intervenors.

With the posture of the case thus established by the pleadings the cause was noticed for trial.

The court is not unmindful of expressions contained in the final judgment entered after the previous trial which seemed to indicate findings of fact relative to certain budget categories then in dispute. On the other hand the court did not then consider, nor did it intend, a disposition on the merits of the factual situation appearing from the first trial. On the contrary the court considered the case to have been disposed of as a matter of law.

Beyond that there are two circumstances which dictate the necessity for taking new or additional evidence relative to the issues of the presence of a "real and substantial" benefit to the incorporated areas. In the first place the stipulation of the parties not only eliminated the bulk of disputed budget items, but also conceded the necessity for "the taking of such testimony as the court deems appropriate" in order to secure a "determination by the court."

Secondly, this court is not required to operate in a vacuum and it is manifest that many changes have occurred in county government since this action was originally filed. The court could hardly fail to take judicial notice that Broward County has adopted and is currently operating under a charter giving it all the powers of local self-government not inconsistent with the constitution and general law. Furthermore, at least two of the budget categories yet to be determined were, at the time this action was originally filed, in their infancy. In fact evidence adduced at the earlier hearings indicated that the county government intended, and was then in the process of expanding those services to become countywide in scope. Therefore, in many respects this is a new lawsuit in practical effect, though the parties and basic issues are substantially the same.

Trial then proceeded, without a jury, to determine first, whether the three budget categories of expenditures still in dispute were of any real and substantial benefit to taxpayers residing in and paying taxes upon property located within municipalities. Since plaintiffs challenged these budget items and had asserted that the expenditures were of no real and substantial benefit, the burden of going forward as well as the burden of persuasion was plaintiffs to bear. On the issue of the Sheriff's Road Patrol these burdens were upon the intervenors.

Having heard the testimony of all parties, having received in evidence various documentary exhibits of each and having heard

argument of the respective counsel, the court has arrived at certain conclusions of both fact and law. Taking each category in the order presented by the referenced stipulation and the pleadings relative to intervenors' complaint, there follows below a summary of the relevant evidence adduced, the findings of fact based upon that evidence and the conclusions of law dictated by such findings as to each category —

I. The first item for consideration is designated (1) the cost of the Division of Libraries.

From the evidence adduced by plaintiffs' witnesses and exhibits, and the arguments advanced by plaintiffs' counsel, it would appear that plaintiffs do not seriously contend that the county system of libraries does not offer library service countywide. On the contrary, it appeared from some of the testimony offered by plaintiffs that the county system is used extensively by people residing in the municipalities. It further appeared that the library facilities operated by Broward County were in fact situated in various municipalities in facilities previously owned and operated as city libraries.

Plaintiffs adduced evidence that some city governments within Broward County had "joined" the county library system. This was accomplished by way of a contract described as a lease under the terms of which Broward County took over the operation of certain municipally owned and operated library facilities. The principal facilities involved here were the Fort Lauderdale City Library and the Hollywood system. Through plaintiffs' witnesses it was made to appear that other cities had elected to continue to maintain their own library systems, but supported the efforts of the county government to establish a countywide system.

The bulk of the testimony of plaintiffs' witnesses was in the form of opinion and demonstrated either disenchantment with the manner in which the county library system was operated or in the alternative a rather rigid attitude with respect to which governmental entity could best operate a library system.

The main thrust of plaintiffs' contentions with respect to libraries was that the level of service offered by the county was inferior to that offered by those cities still maintaining a municipal system. In addition plaintiffs contended that those cities electing to operate their own library system should not only be permitted that right but should also be exempted from any county ad valorem tax to be used for county library purposes.

In summary plaintiffs offered little or no affirmative showing that there were "no real and substantial" municipal benefits from the operation of the Division of Libraries of Broward County.

There was evidence that the level of service was less than satisfactory to some of plaintiffs' witnesses. On the other hand evidence as to the objective criteria or standards to be applied in arriving at a judgment or determination of "satisfactory" was inconclusive and somewhat subjective.

Witnesses for the defendant county sharply contradicted the opinions of the witnesses of plaintiffs on both the issue of the appropriate governmental unit to operate a library system as well as the level of service offered by the county library system. More than that, however, the county's witnesses testified in some detail with respect to the progress already made by the county in developing and expanding a countywide library system. Their testimony also indicated continuing plans and efforts at further expansion. Several civic-minded witnesses, whose previous voluntary efforts and involvements in support of libraries in general was apparent, were called by the county. Their testimony tended to confirm satisfaction with both the level of service and the progress being made.

Other county witnesses testified as to the desirability of a system of libraries available to all county residents relating the need to education both formal and informal. Their testimony was to the effect that the tax base available countywide for support of the system offered greater development potential than could be expected for systems limited in scope to cities and their more restricted budgets.

Finally, county witnesses testified that the county concept makes available to a larger class of users a central library inventory of reference materials which, due to cost, could not fesibly be carried by smaller city oriented systems.

Considering the foregoing evidence in the light of the issue to be determined, the court makes the following findings of fact —

(A) The court finds that a County Division of Libraries is a proper county function; that it is and has been at all times material to this cause operated on a countywide basis; and that the users of the county library services reside both within the incorporated and unincorporated areas of the county.

(B) The court finds that the test for determining the benefit is not the geographic location of the several library facilities. On the contrary, it is the user of the system and the user's place of residence that is significant. The court further finds that the majority of the users of the county system are residents of the various and several municipal or incorporated areas of the county.

(C) The court finds that the existence of a city library system within a particular municipality or the expressed desire of a partic-

ular municipality to operate a library system is neither germane nor relevant to the determination of whether a real and substantial benefit accrues to the property and taxpayers of such city. So long as the county system offers and makes available its services to all county residents it is not the prerogative of a particular municipal governing body to determine whether the citizens of such city may utilize or receive the benefits of the service.

(D) The court finds that the existence of both city and county library systems are neither competitive nor mutually incompatible. Municipal residents and taxpayers have the option of providing themselves with the convenience and benefit of a municipal library system even at the cost of some duplication. It is evident that some have so elected while some have not. Such an election, however, does not lessen the "real and substantial" benefit enjoyed by residents of the incorporated areas from the operation and attendant cost of the county library system.

(E) The court finds as a matter of law that plaintiffs have failed to sustain their burden of proof on the issue of the cost of the Division of Libraries and that on the contrary the operation of the Division of Libraries is of real and substantial benefit to the property residents and taxpayers of the incorporated areas of the county.

Based upon the foregoing findings of fact and conclusions of law the court declares that budgeted expenditures and ad valorem taxes levied and collected by Broward County on properties located within the incorporated areas of the county are proper and legal levies and accordingly, the plaintiffs are not entitled to any relief with respect to this item.

II. The second budget item or category for consideration is (2) the cost of the Division of Emergency Medical Services referred to hereafter as EMS.

Evidence offered by plaintiffs relative to this category tended to prove primarily that a number of municipalities in Broward County were operating their own municipal emergency medical service. The testimony further showed that the level of service, including number of vehicles, training of personnel, manpower, budget and finally response time were considered satisfactory. Opinions varied as to whether the level of service was greater than, less than or equal to the EMS offered by Broward County.

The nature of plaintiffs' proof regarding EMS, as in the case of libraries appeared to be directed at a showing that in those cities which elected to provide and pay for a city operated emergency medical service the city taxpayers should be accorded an exemption

from any county taxes to support any similar or duplicate county service. This contention was advanced irrespective of testimony from plaintiffs' own witnesses which showed that Broward County has offered to provide the EMS to all the cities in the county which operated a city EMS.

Plaintiffs called as their witnesses both the County Administrator, Lewis Hester and the Director of EMS, Richard Beeman. Beeman testified that the policy of the county EMS was to respond to calls in any area of the county including those cities operating a city EMS. Beeman conceded, however, that the county service seldom received calls into the cities of Pompano, Hallandale or Hollywood.

On cross examination it was brought out that the reason few emergency calls were directed to county EMS for the mentioned cities was a result of the method of operation of the Central Dispatch Center or CDC. Testimony established that most emergency calls are made on the 911 telephone number. Depending upon the location of the emergency the calls are relayed by the 911 center to one of the several CDC stations. These stations then dispatch an EMS unit which might be either a county or city unit depending again primarily upon the site of the emergency.

In the case of Pompano and Hollywood the CDC is operated by the respective police departments of such cities and the city policy is to dispatch the city EMS unit. It was conceded by these witnesses that on occasion the city unit would request an assist or "back-up" from the county unit. Evidence indicated that county units provided such assists or backups when requested.

Competition and rivalry between the city and county EMS was abundantly clear from the nature and tone of the testimony. No persuasive evidence was adduced which tended to show that either operation was not adequate at least within the geographic areas that each service sought to cover. On the other hand several deficiencies of the present dual arrangement were exposed. For instance, city units are not permitted to answer emergency calls outside municipal limits no matter how close the emergency scene might be. On the other hand where city administrations have evinced a negative attitude toward county EMS, the county service has apparently attempted to avoid confrontations by answering calls inside those municipalities only when specifically requested by the city EMS. It is the court's opinion that neither attitude is calculated to fully serve the public purpose for which the service is obviously designed nor to discharge the needed function. These practices could well produce absurd results in a metropolitan county such as Broward if permitted to continue.

The court, in any event, found very little of the summarized testimony to be either helpful or persuasive in the determination required to resolve the issue raised. What was persuasive, and in the court's opinion, determinative, however, was the testimony of Lewis Hester, the county administrator. Mr. Hester testified, as plaintiffs' witness, that it was the plan of the county to ultimately provide a countywide EMS without regard to municipal boundaries. On the other hand Hester conceded that the county's approach to providing that service was, thus far, limited to an offer by the county to purchase the equipment currently owned and operated by the various cities operating a city EMS. In some instances the county would offer to absorb or employ the existing city EMS personnel. In other cases where the level of training did not meet county standards this offer was not made.

In addition the city was required to furnish facilities for housing county equipment, vehicles and personnel. It was conceded that certain cities have declined to accept the offer. In those instances the county appears to have allowed the matter to drop. Testimony of certain plaintiffs' witnesses exhibited a cautious attitude on the part of the cities. It was evident that some were reluctant to adopt the county program without assurance that a satisfactory level of service would be maintained. It was also evident that some city officials were simply unwilling to surrender any of their power or prerogatives.

Neither plaintiffs nor defendant has cited any authority or offered any evidence to show that either the county government or the respective city governments have exclusive rights to the operation of emergency medical services. It appears that historically, what is now referred to as emergency medical service was an outgrowth of earlier municipal operations by either police or fire departments as a rescue service or other similar names.

In early 1974 Broward County began a pilot program, federally financed, in western Broward County, the purpose of which was to determine the feasibility of a countywide emergency medical service. Apparently believing the program to be successful and to promise greater benefits in the future, the county commission undertook expansion of the service. The court finds that such an operation is clearly within the powers conferred upon the county government by its charter and by the constitution and general law of Florida.

On the other hand, prima facie, the municipal corporations have been granted similar authority by their respective charters. Many of the more populous municipalities in Broward County have undertaken to furnish emergency service as a part of city governmental operation. Most of the city emergency services appear to have pre-existed the county's entrance into the field and under the circum-

stances it is not difficult to understand the attitude of those cities which have invested in equipment and training of personnel. Add to these circumstances the understandable municipal pride and a conflict between the two governmental entities was inevitable.

The court is inclined to the opinion that a county operated emergency medical service would ultimately be more likely to result in a more complete and efficient service and afford a greater overall benefit to the public. On the other hand if the service offered by the county does not fulfill the need or if the county offer is conditional or qualified, the city officials may quite properly undertake to provide their citizens with the type of service which their officials believe to best fill the needs. It is clear from the evidence that the county has not fully offered to satisfy that need.

On the contrary the policy of the county administration and the county commission has been to provide only a "qualified" offer of emergency medical service. The conditions attached to the offer of the service although perhaps logically designed to make the expansion of the EMS economically feasible for the county, clearly fall short of the requirements necessary to provide a "real and substantial" benefit to the taxpayers and residents of those cities currently providing a city EMS. Possibly the attitude reflected in the testimony of Hester and in the policy of the county commission is a result of a misconception of the county's role in providing certain governmental services. It is the citizen taxpayers to whom the services must be provided not the city governments. Further, the city officials do not have a right to reject a county service in behalf of the residents of their respective cities. Both the county commission and the county administrator must understand, and give effect to, the concept that the service must be provided to the citizens of the county wherever they may reside. The city governments are simply not appropriate parties to such a concept. If the county commission expects to levy ad valorem taxes on properties located within the municipalities then the service must be made available unconditionally without regard to municipal boundaries. The county emergency medical service must be prepared to provide its own housing of the EMS units and personnel and must plan and provide both vehicles, equipment, dispatching and personnel necessary to operate same with or without the the assistance of the respective cities. Of course the city governments in a spirit of cooperation are quite free to offer assistance in any of these matters, but they cannot be so compelled.

For the foregoing reasons the court finds that the costs of the Division of Emergency Medical Service is of no real and substantial benefit to the residents or properties of those municipalities currently providing a city operated and maintained emergency medical service.

III. The costs of the Division of Parks and Beaches.

Perhaps the most easily resolved issue in this complex lawsuit is the determination of the benefit bestowed by the operation of the Division of Parks and Beaches by Broward County. The evidence adduced by plaintiffs relative to this issue established that the Division of Parks and Beaches operates a number of parks throughout Broward County. These parks are divided into three categories, as follows — "regional," "urban" and "neighborhood." Regional parks were described as those consisting of 90 acres or more, while urban parks were generally described by size as consisting of an area greater than 50 acres. The neighborhood parks were described as being an average size of approximately 10 acres and consisted of various types of facilities, many of which were located on property belonging to the school board which were leased to the county to be operated as parks. For the most part, these neighborhood facilities consist of ball fields and playgrounds where sports activities can be conducted.

The other criteria for distinguishing between the three categories of parks involved the types of facilities, the unique nature of the park, and the location. It appears that the county currently owns and operates five parks which fall in the regional category and two which fall in the urban category. Both the regional and urban parks were used extensively by people from all over the county — there are no fees charged and the parks are freely open to anyone desiring to use them. Both the regional and urban parks are used by citizens of the entire county, including people who reside within the various municipalities. Furthermore, the smaller parks described as neighborhood parks are not calculated to draw users from the entire county, but are intended to provide facilities for persons living in closer proximity. It appeared that none of these neighborhood parks were located within any of the municipal boundaries of any of the cities in Broward County.

It appears to the court that the evidence presented by plaintiffs establishes conclusively that budgeted expenditures for the operation of the "regional" and "urban" parks are of a real and substantial benefit to all the residents, taxpayers and properties of Broward County. By inclusion, therefore, this would apply to the residents, taxpayers and properties located within the various municipalities. With regard to that portion of the budget of the Division of Parks and Beaches and the ad valorem taxes imposed upon municipally situated properties for the support of regional and urban parks, the plaintiffs are therefore entitled to no relief.

The pertinent portions of the evidence offered by plaintiffs relative to the "neighborhood" parks was provided by staff per-

sonnel of the Division of Parks and Beaches as well as members of the county commission. Testimony of at least one of the commissioners reflected some doubt as to the propriety of taxing the costs of operating "neighborhood" parks to the incorporated areas.

The most significant fact brought forth in this connection was that all of the "neighborhood" parks were located in the unincorporated area of the county. It was also undisputed that these parks because of the relatively small size were not likely to attract users beyond the immediate vicinity. It was more or less tacitly conceded by defendant that the local or neighborhood parks were more appropriately the responsibility of the municipal governments. Consistent with that philosophy is the fact that the county does not provide or maintain a single neighborhood park within the municipal limits of any city.

It was brought out in defendant's evidence that a portion of the expenditures included under the sub-category of neighborhood parks could be attributed to use of the facilities by softball and little league ball clubs and other county sponsored youth and recreation programs. The court finds that while these recreation programs may be a proper county function and that they may confer benefits indirectly to the incorporated areas that nevertheless the benefit could not overcome the deficiency previously discussed.

If by appropriate allocation within the budget of Parks and Beaches the recreational program expenditures can be separated from those attendant to neighborhood parks, this court would not be inclined to deny the county the right to impose ad valorem taxes on municipally situated properties to support same.

On the other hand until and unless some such reallocation is made by the county, the court is compelled to the conclusion that expenditures for the operation and maintenance of those parks designated by the county as "neighborhood" parks are of no real and substantial benefit to any of the taxpayers, residents or properties in any of the municipalities in Broward County.

IV. The only remaining issue requiring a determination of fact is that raised by the complaint of intervenors Robert Allen and Charles K. Vermorel.

If the facts concerning the benefits of the Sheriff's Road Patrol are found to be as alleged by intervenors' complaint and contrary to the finding of the board of county commissioners in the determination reflected in the stipulation between plaintiffs and defendants then the question arises as to what if any relief may be granted.

It is necessary to an orderly analysis and discussion of this issue to first pinpoint and identify the subject under discussion. The only

available source of identification from the record in this case must be by reference to the stipulation itself and the intervenors' complaint. At this point it must be noted that the court has been asked to approve, ratify and enforce the terms of the stipulation by both plaintiffs and defendant. Of course, intervenors in their complaint express a contrary view and prayer at least with respect to the Sheriff's Road Patrol.

For purposes of the determination required therefore, the term "Sheriff's Road Patrol" wherever used herein is intended to encompass the matters reflected in that portion of the stipulation quoted below: —

> "The Sheriff's Road Patrol together with an appropriate percentage of the Sheriff's Department administrative overhead properly apportionable to the road patrol activity of the Sheriff's Department. These administrative overhead items include the following:
>
> Finance
> Administrative
> Internal Affairs
> Service Center
> F. I. C. A."

Whether the stipulation should be approved, ratified and given effect by the court is dependent upon the same application of law and fact required for a determination of the issue raised in intervenors' complaint.

The court might well ignore deficiencies in a stipulation of parties to a lawsuit where the effect is merely to remove from contention certain issues of either law or fact even where the court might disagree with the wisdom or total accuracy of same. A different responsibility is imposed, however, where the court is asked to incorporate the stipulation in its final judgment and enforce the terms thereof. This is especially true in matters affecting a great public interest as is certainly the case in this litigation. For these reasons the court has carefully examined the provision of the stipulation quoted above relative to the "Sheriff's Road Patrol."

The first matter to be considered is the language of the quoted provision in terms of just what it can be said to establish and in terms of its enforceability. Secondly, then we may proceed with the issue raised by intervenors concerning the factual basis of the provision.

It should be observed at the outset that nowhere is there set forth any description or definition of any of the "overhead items." In addition there are no standards established which would furnish any guidance in a determination as to just which costs or expenditures were "properly apportionable" to the road patrol activity.

In view of the absence of any attempt by the county commission to fix the amounts of these items it is evident that this apportionment would necessarily be left to some unidentified administrative personnel and process. No evidence was adduced by either plaintiffs or defendant which in any way explained, clarified or added to the quoted language. Nothing in the record establishes the means employed in making the apportionments required in setting the listed items in the sheriff's budget.

Counsel for both plaintiffs and defendant repeatedly asserted that the determination of these matters of benefit and burden was a purely legislative function reserved to the board of county commissioners. The court agrees. The court further recognizes the practical necessity, at times, for a delegation of responsibility and power by legislative bodies. A concomitant and essential ingredient of such delegations, however, is the establishment of standards for the exercise of the delegated power. Lack of standards in such circumstances is a frequent ground for judicial disapproval of a delegation of power.

In the matter discussed here the items in question are not defined, there are no standards established whereby the necessary apportionments are to be made and, indeed, there is no designation of office, agency or authority for the making of such apportionments.

Assuming that the court could approve the stipulation and in fact incorporated same in any final judgment the question of enforceability remains. A post judgment dispute between the parties requiring interpretation or enforcement by the court would no doubt require relitigation of many matters which should be laid to rest by the court's judgment. For instance if plaintiffs were dissatisfied with the manner of apportioning "administrative overhead" and sought relief, both the court and the parties would be without any guidelines to assist in determining which expenses were properly matters of "Finance" "Administrative" or "Internal Affairs." At this writing the court has not even a faint notion as to the intended meaning of "Service Center" or how it might relate to the general activities of the "Road Patrol." Again no proof was offered which would shed any light upon these matters.

For the reasons stated therefor the court specifically dissapproves of that portion of the stipulation quoted above beginning with the words "together with an appropriate precentage of the Sheriff's

Department Administrative Overhead, etc. etc." and including the remaining language in paragraphs A.(1) of the stipulation.

In connection with the issues raised by intervenors' complaint and the defenses raised by plaintiffs and defendant that the stipulation reflects a legislative determination suffice it to say that the language under consideration can hardly be described as more than a "partial legislative determination." This partial determination is, of course, subject to the same frailities discussed above in connection with judicial enforcement. Any attempt to salvage the quoted provision by reading into it an implied delegation of authority to fill in the necessary details must likewise fail for lack of standards. Under these circumstances the court finds as a matter of law that the portion of the stipulation referring to "an appropriate percentage of the Sheriff's Department Administrative Overhead" and the items included thereunder constitute an invalid attempt to delegate legislative functions and authority and is therefore void for vagueness.

Intervenors proceeded with their proof relative to the issue of the benefits derived from the activities and operation of the portion of the sheriff's budget identified as "Road Patrol." Testimony of Sheriff Edward J. Stack established that the "Road Patrol" was also synonymous with the term "uniformed division;" that the "uniformed division" employs 130 deputies each driving a patrol car; and that the sheriff's constitutional and statutory powers make him the conservator of the peace within Broward County including both incorporated and unincorporated areas.

In addition it was of course established that the sheriff is the chief executive officer of the circuit and county courts of Broward County. In that capacity the sheriff and his deputies have the responsibility of serving process and enforcing the decrees, orders and judgments of those courts throughout the entire county.

The sheriff testified that the enforcement of certain orders such as eviction proceedings by his "civil deputies" is assisted and supported by the uniformed division or Road Patrol in order to prevent breaches of the peace.

A significant portion of the sheriff's testimony dealt with his policy of requiring each deputy to drive his marked patrol car to and from the deputies' place of residence. It was established furthermore that the deputies under certain conditions were permitted off duty use of patrol cars with the specific purpose of "being visible" and as a deterrent to crime by their presence upon the streets.

The sheriff testified that 77 percent of his deputies resided in an incorporated area of the county; that the patrol function of the

"Road Patrol" was principally directed at patroling the unincorported areas of the county; that the county was divided into nine patrol zones covering all the unincorporated area and that it was invariably necessary to travel through one or more of the municipalities in order for a patrol unit to reach any of the nine patrol zones.

Additional testimony by Sheriff Stack showed that the sheriff's department frequently is called upon to assist or furnish "back-up" for the various municipal police departments and that such "back-up" is provided by the "Road Patrol" or "uniformed division."

It was the opinion of Sheriff Stack that without the "Road Patrol" activities, the unincorporated areas of Broward County would become a "lawless jungle" and a "haven for criminals."

The sheriff exhibited a map of Broward County which showed graphically the nine patrol zones and their respective geographic relationship to the various municipalities in Broward County. The map reveals for instance in the more populated areas of the county that many of the patrol zones (unincorporated areas) are bound on two, three and in some cases four sides by one, two or three municipalities. It is easy to see from this geographical arrangement that without the Sheriff's Road Patrol these areas could, and probably would, become pockets of lawlessness. The impact on the adjacent municipalities under such circumstances is obvious.

While all the foregoing testimony stood more or less uncontroverted and was persuasive, there were several items which the court found to be most persuasive and, in the final analysis determinative of the items in dispute.

Accordingly, with respect to the benefits derived from the operation and activities of the Sheriff's Road Patrol and the cost of same, the court makes the following findings of fact —

(A) That the Road Patrol activities are necessary to and inseparable from, the support and assistance required by the sheriff to carry his responsibilities as the chief executive officer of the courts of Broward County all over the county.

(B) That the Road Patrol activities are essential to discharge the responsibilities of the sheriff as the conservator of the peace in all of Broward County including the incorporated and unincorporated areas.

(C) That the Road Patrol activities by virtue of their presence and visibility operate as a crime deterrent in both incorporated and unincorporated areas.

(D) That the Road Patrol activity is necessary to insure the safety of all Broward County residents in travel between the various municipalities through the unincorporated area.

(E) That perhaps the most important function of the Road Patrol is to prevent the unincorporated areas of the county from becoming pockets of lawlessness and havens for criminals. That crime and criminals do not respect municipal boundaries and that the existence of a "lawless jungle" in the unincorporated areas would necessarily become havens for criminals who could, with impunity, commit crimes in the more populated and affluent incorporated areas and retreat to the unincorporated areas beyond the reach of the municipal police. That such a situation if allowed to develop would inevitably spill over into the cities and thereby increase the law enforcement burden of the municipalities and threaten the security and safety of the residents of same.

(F) Finally, the court finds that it is neither possible nor appropriate to attempt to compartmentalize the operation of the sheriff's department by an artificial and basically arbitrary separation of either function or cost of the Sheriff's Road Patrol.

(G) That the operation and activities of the Sheriff's Road Patrol is of a real and substantial benefit to both the incorporated and unincorporated areas of Broward County.

Based upon the foregoing findings of fact, the court is compelled to the conclusion of law that the legislative determination by the board of county commissioners relative to the benefits derived from the operation of the Sheriff's Road Patrol were so devoid of any basis in fact that the determination may be described as arbitrary and capricious. On the other hand, in the light of the controlling law, this circumstance would not ordinarily permit this court to substitute its judgment for that of the board of county commissioners unless it can be shown that the determination effectively violates a constitutional or statutory provision. *Owen* v. *Cheney,* 238 So.2d 650 (2d Dist. 1970).

The constitutional provision relied upon by plaintiffs in this cause is the proscription found in Article VIII, Section 1(h) of the Florida Constitution which prohibits the levy of ad valorem taxes against property situate within municipalities for services rendered by the county for the benefit of the property or residents in unincorporated areas. The foregoing findings of fact relative to the benefits of the Sheriff's Road Patrol would clearly permit the levy of ad valorem taxes against municipally situated properties to support the Sheriff's Road Patrol had the county commission so determined. But the constitutional provision referred to did not in and of itself mandate this levy.

The ad valorem tax levy complained of by intervenors was imposed by the board of county commissioners through the creation of a special municipal taxing unit authorized by Article I, Section 1.04 of the charter of Broward County. That provision is quoted below —

"Section 1.04.  SPECIAL POWERS OF THE COUNTY.  The County shall have all necessary powers to accomplish municipal purposes within the unincorporated areas of the County through the creation of special municipal taxing units with independent budgets. Property situated within municipalities shall not be subject to taxation for services rendered by the County exclusively for the benefit of the property or residents not within municipal boundaries, nor shall property situated in the unincorporated area of the County be subject to taxation for services provided by the County exclusively for the benefit of the property or residents within municipal boundaries."

While it is clear from the first sentence of Section 1.04 that the authority to establish the municipal taxing unit is provided in the charter, it is equally clear from the remaining language in this provision that the people of Broward County in adopting the charter went one step further than the constitutional proscription in Article VIII, Section 1(h). This language clearly prohibits the imposition of ad valorem taxes on the unincorporated areas for services exclusively for the benefit of property or residents within municipal boundaries. The similarity of the language to that of the constitutional provision is unmistakable in its intent. The court must conclude that the meaning of "exclusively" must be given the same interpretation previously applied by the Supreme Court of Florida in the cases construing Article VIII, Section 1(h) of the Florida Constitution. Applying this interpretation to Article I, Section 1.04 of the Broward County Charter it becomes clear that the intent is to prohibit imposition of ad valorem taxes on any property in Broward County which does not receive a "real and substantial" benefit from the activity or service which is paid for by such tax.

Considering the evidence adduced on the issue of the Sheriff's Road Patrol it appears that the incorporated areas of the county may well receive an even greater benefit from this activity than the unincorporated areas. In any event the benefit to both areas is "real and substantial." Accordingly, a determintion to ignore the benefit accruing to the cities and impose the burden upon the unincorporated areas is arbitrary and capricous. In addition such a treatment is patently unequal. Where there is no rational basis for the inequality the result is a denial of equal protection of the rights of those taxpayers whose properties lie within the unincorporated areas.

Assuming that the charter did not intend to authorize unequal treatment of citizens or unequal taxation of their properties the court interprets section 1.04 of Article I to require that the burden of taxation be spread on any and all property which receives any real and substantial benefit from the service or activity supported by the tax.

Under the circumstances, therefore, the determination of the county commission to tax the cost of the Sheriff's Road Patrol to the unincorporated area of the county violated Article I, Section 1.04 of the Broward County Charter. Under these circumstances, the court has no prerogative but to declare this legislative determination to be void as a matter of law.

Having declared the rights of the parties as reflected in the foregoing, we turn now to the matter of the remedies to be provided.

Based upon the findings of fact, conclusions of law, and declarations of the rights reflected in the foregoing, it follows that both plaintiffs and intervenors are entitled to relief as to those budget items found to have been improperly taxed.

Accordingly, it is ordered and adjudged that Broward County is hereby enjoined and restrained in the following respects —

(1) Broward County is enjoined from imposing or levying ad valorem taxes, or from the collection of same, for any ensuing budget year on properties lying within the municipal limits of those cities which are currently not being served by the Division of Emergency Medical Services of Broward County and which are providing a city-owned and operated emergency medical service. It is the intention of the court that this injunction remain in effect until such time as Broward County furnishes such emergency medical service to the residents of those municipalities which the record establishes are currently providing and paying for their own emergency medical service. Those cities are Dania, Deerfield Beach, Hallandale, Hollywood, Lauderdale Lakes, Margate, Miramar, Oakland Park, Pembroke Pines, Pompano Beach and Sunrise. The court retains jurisdiction of this cause for the purpose of enforcing the terms of this injunction and for the purpose, upon proper application by Broward County, of modifying in whole or in part or dissolving this injunction upon a showing by Broward County that the emergency medical services are being provided to any or all of the listed municipal areas at the same level of service provided to those areas of the county which are presently being benefited by the cost of the Division of Emergency Medical Services.

(2) Broward County is enjoined from imposing or levying ad valorem taxes, or from the collection of same, for any ensuing budget year, on properties lying within the municipal limits of any of the cities in Broward County for the purpose of funding or supporting the cost of that portion of the budget of the Division of Parks and Beaches which was identified in the record as the "neighborhood" parks. The court likewise retains jurisdiction of this cause for the purpose of enforcing the terms of this injunction and for the purpose of entering such other and further orders as may be necessary in order to give effect to this judgment in the context of those matters discussed above in connection with the issue of the benefits derived with respect to the cost of the Division of Parks and Beaches.

(3) For any ensuing budget year Broward County is enjoined from levying and collecting taxes solely upon the properties located within the unincorporated areas of Broward County for the support of the cost of the operation and activities of the Sheriff's Road Patrol and in the alternative is mandatorily enjoined and ordered for any ensuing budget year to levy and collect such taxes as are required for the funding and support of the Sheriff's Road Patrol uniformly on all properties located within Broward County, including both incorporated and unincorporated areas. The court retains jurisdiction of this cause for the purpose of enforcing both the prohibitory and mandatory portions of this order and for the purpose of entering such other and further relief as may be deemed appropriate from time to time.

Plaintiffs have urged upon the court their demand for a refund of those taxes found to have been improperly or illegally levied and collected during the 1976-77 budget year. This application for relief the court hereby denies.

The two categories which the court has found to have been improperly taxed to property lying within municipalities are Emergency Medical Services and that portion of the budget of the Division of Parks and Beaches referred to as "neighborhood parks."

At no time has it appeared that the defendant county was not acting in good faith in the determinations to levy such taxes. There were no allegations or proof offered by plaintiffs that any of the referenced taxes were paid under protest or that a fund for the amounts involved was ever created. Plaintiffs' Exhibit No. 10 showed that approximately $561,525.00 was collected from the eleven municipalities operating their own emergency medical services. A proration of this total among all of the properties located within those eleven cities would result in a minimal refund to each of the owners of such property.

In the case of the neighborhood parks, it appears from plaintiffs' Exhibit No. 7 that the taxes allocated to the support of that function amount to $430,606.57. The evidence shows that this amount would have been recovered from all of the properties in Broward County and the individual refund to any taxpayer would be even smaller in proportion. It appears that the county has collected and expended those amounts in good faith. It is evident from the amounts involved that the cost to the county of effecting any refund to those taxpayers who made the payments involved would far outweigh the benefit to the individual taxpayers. The postage alone would obviously be substantial. In addition there would be the administrative expense of computing and drawing checks for the refund as well as locating the recipients. Moreover, it is obvious that the deficit created by such a refund would have to be recovered in the ensuing budget year by the levy of an additional tax on those same and other properties and taxpayers. For these reasons, the court employing its inherent equitable power will not order such a refund. *Gulesian* v. *Dade County School Board,* 281 So.2d 325 (1973).

Intervenors have not urged any refund of any tax improperly levied with respect to the Road Patrol in the unincorporated area and in any event the amount is minimal. Accordingly, employing the same logic reflected above, no refund of those taxes is ordered.